IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CHRISTOPHER KAGAWA,<br><br>     Plaintiff,<br><br>  vs.<br><br>COUNTY OF HAWAI'I POLICE<br>DEPARTMENT, ALRIC DALERE, in<br>his individual capacity, and MICHAEL<br>SANTOS, in his individual capacity, *et al.*,<br><br>     Defendants. | Civil No. 23-00105 MWJS-KJM<br><br>ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT |

## **INTRODUCTION**

On July 22, 2021, police responded to a stand-off between two men in Hilo. It all started when Plaintiff Christopher Kagawa learned that his former employee, Llewellyn Kaui, had allegedly stolen gas cards from his concrete pumping business. Kagawa reported the alleged theft to the police. Word got back to Kaui, and Kaui contacted Kagawa, insisting that he did not steal from the company. After some back and forth on the phone, Kaui showed up at Kagawa's house.

When officers arrived at the scene, they discovered Kaui on Kagawa's driveway "crying, shirtless, on his knees with his hands in the air." Facing him, wearing a bulletproof vest, with a handgun in his holster and an additional handgun and rifle on the ground next to him, was Kagawa. The police handcuffed both men. And they

recovered for safekeeping a total of thirteen other firearms in fallback positions across Kagawa's property.

Kagawa was arrested and taken to the police station overnight. While at the station, Kagawa requested medical attention for a "tingly feeling in both his arms." The Hawai'i County Fire Department arrived within ten minutes, conducted a welfare check, and determined emergency medical services were not needed. But Kagawa was still transported to the hospital within the following hour, where stroke protocol was initiated. Subsequent testing did not turn up symptoms consistent with a stroke, and Kagawa was discharged in good condition. The next day, Kagawa was charged with Terroristic Threatening in the First Degree, interrogated by Defendants Officer Alric Dalere and Sergeant Michael Santos, and then released on bail. The charge was eventually dismissed.

Kagawa thereafter brought this action against the County of Hawai'i Police Department, Officer Dalere, and Sergeant Santos, primarily alleging that the police used excessive force by handcuffing him too tightly, and that that force caused him to later suffer a stroke while he was at the station. He also argues that Officer Dalere failed to bring his needed medications to the station and thereby denied him adequate medical care.

Defendants have moved for summary judgment on all claims. They point out that Kagawa's arrest was captured on video footage, which shows that Kagawa did not

appear uncomfortable and that he only vaguely complained about the handcuffs once—
at which point an officer immediately checked the handcuffs and confirmed they were
loose.  Defendants further note that there is no evidence that Kagawa ever suffered a
stroke, let alone that he suffered one because of excessively tight handcuffs.  And they
argue that the evidence establishes as a matter of law that officers responsibly handled
Kagawa's medications, and any failure to immediately bring those medications—which
he himself acknowledged, on video, he had not been regularly taking—to the station
had no effect on his physical wellbeing.

For the reasons explained below, Defendants' motion for summary judgment is
GRANTED.

## BACKGROUND

The arrest at issue stemmed from a stand-off between Plaintiff Christopher
Kagawa and his former employee, Llewellyn Kaui.  Kagawa owned a concrete pumping
business, and Kaui worked for him.  Dkt. No. 90, at PageID.1166-67 (Kagawa Decl. ¶¶ 5,
8).  While he was employed, Kaui reported to Kagawa that one of the company's fuel
credit cards was missing, and Kagawa "also discovered that the replacement card" was
missing.  *Id.* at PageID.1169 (¶ 19).  Kaui eventually stopped showing up to work, and
Kagawa assumed that he had quit.  *Id.* at PageID.1168 (¶ 15).  A few weeks later,
Kagawa was notified by the fuel credit card company that there were charges to the
missing cards, and the company sent Kagawa footage that "showed Mr. Kaui and his

3

associates using the stolen [fuel] credit card." *Id.* at PageID.1169 (¶ 20).  Kagawa then

reported the stolen cards to the Hawai'i County Police Department (HCPD), and a

police officer came to his company's property to take a statement from Kagawa and his

wife.  *Id.* at PageID.1169-70 (¶ 21).  No police report was filed at that time.  *Id.* at

PageID.1170 (¶ 22).

      That brings us to the date of the incident between Kagawa and Kaui, July 22,

2021.  That day, Kaui contacted a coworker of Kagawa's asking why Kagawa was

accusing Kaui of stealing from the company.  *Id.* at PageID.1171 (¶ 25).  Kaui then called

Kagawa, and the two talked.  *Id.* (¶¶ 26-27).  The parties differ in their versions of who

said what:  Kagawa represents that Kaui said "I'm coming over!"  *Id.* (¶ 27).  Kaui states

that Kagawa told him to come over.  Dkt. No. 79-4, at PageID.338 (Kaui Decl. ¶ 5).

Either way, Kaui showed up at Kagawa's property.  What happened next is the subject

of the lawsuit and was captured on various video cameras.[1]

---

[1]     Both parties attach several video exhibits in support of and opposition to the
summary judgment motion, and the authenticity of these exhibits is not contested.  At
summary judgment, "a district court may properly view the facts in the light depicted
by bodycam footage and its accompanying audio, to the extent the footage and audio
*blatantly* contradict testimonial evidence."  *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th
Cir. 2022); *Doyle v. City of Medford*, Civ. No. 16-cv-01376, 2017 WL 3784038, at *6 (D. Or.
Aug. 31, 2017) ("A court may properly consider video evidence in ruling on a motion
for summary judgment and should view the facts 'in the light depicted by the
videotape.'" (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)), *aff'd*, 742 F. App'x 342
(9th Cir. 2018).

Video footage from a home security camera shows that around 5:40 p.m.,
Kagawa was wearing a bulletproof vest, holding a rifle, with a handgun holstered while
pacing back and forth in front of his residence.  Dkt. No. 79-23 (Defs.' Video Exh. D).  It
appears he was talking on the phone.  *Id.* at 00:14-00:20.  After stepping out of the frame
briefly, Kagawa reappeared and walked towards the top of his driveway, while
appearing to talk to someone down the driveway and gesturing with his hands.  *Id.* at
00:53-1:12.  He then threw his phone to the ground, *id.* at 1:13, and he continued to
gesture and speak while facing his driveway, *id.* at 1:14-1:35.

Around 5:53 p.m., HCPD officers were dispatched to Kagawa's residence in
response to an anonymous tip that there was an ongoing altercation between two men,
with one possibly armed.  Dkt. No. 79, at PageID.318 (Defs.' Concise Statement of Facts
(CSF) ¶ 1); Dkt. No. 79-21, at PageID.408.  When officers arrived at the scene, they
encountered a man—later identified as Kaui—facing Kagawa in the middle of a long
driveway "crying, shirtless, on his knees with his hands in the air."  Dkt. No. 79, at
PageID.318 (Defs.' CSF ¶ 2); *see also* Dkt. No. 89, at PageID.1161 (Pl.'s Response to Defs.'
CSF ¶ 2) ("Undisputed").  Officers Alric Dalere and Oliver Agustin detained Kaui, and
Officer Agustin handcuffed him pending further investigation.  Dkt. No. 79, at
PageID.319 (Defs.' CSF ¶ 4).  Officer Jayce Carvalho detained and handcuffed Kagawa
"without any complaints."  *Id.* (¶ 11); *see also* Dkt. No. 89, at PageID.1161 (Pl.'s Response
to Defs.' CSF ¶ 11) ("Undisputed"); Dkt. No. 79-24 (Defs.' Video Exh. E, at 2:03-2:27).

Although Kagawa did not complain of any discomfort at that time, he later

detailed that when the handcuffs were placed on him, he felt "discomfort at first," and

then "extreme pain."  Dkt. No. 79-25, at PageID.436; *see* Dkt. No. 90, at PageID.1174

(Kagawa Decl. ¶ 42).  But Kagawa did not tell the officers that he was in pain because he

"thought that's how handcuffs were supposed to be."  Dkt. No. 79-25, at PageID.436; *see*

Dkt. No. 90, at PageID.1174 (Kagawa Decl. ¶ 42).

At that point, the officers asked Kagawa if they could enter his residence to

ensure that there was no one else on the property, and he consented.  Dkt. No. 79, at

PageID.320 (Defs.' CSF ¶ 15).  While conducting a search for other persons, officers

observed several additional firearms—in total, thirteen—in various fallback positions

on the property.  *Id.* (¶ 16).  Kagawa later explained that he placed some of the firearms

at the front of his residence just before Kaui arrived.  Dkt. No. 79-25, at PageID.434.

And he placed some of the firearms in his bedroom and living room in case he "needed

to retreat into [his] house."  *Id.* at PageID.435.

After his initial detention, officers moved Kagawa so that he could sit in a chair

underneath a tent because it was raining; neither of the named individual Defendants,

Officer Dalere or Sergeant Michael Santos, were among those officers.  *See, e.g.*, Dkt. No.

79-28 (Defs.' Video Exh. I, at 11:10-11:20).  At least twenty minutes after he was

handcuffed, Kagawa appeared to express discomfort, stating, "it's just these [expletive]

handcuffs."  *Id.* at 20:37-20:39.  Kagawa stated at his deposition that he was "squirming

6

around trying to adjust" in his seat at that time.  Dkt. No. 79-25, at PageID.437.  Body

camera footage shows that Officer Lam Doan and another officer looked at Kagawa's

handcuffs.  Dkt. No. 79-28 (Defs.' Video Exh. I, at 20:39-20:53).  In his declaration,

Officer Doan states that he "checked [Kagawa's] handcuff by verifying there was a gap

between his handcuff and his wrist and found it was not tight."  Dkt. No. 79-7, at

PageID.348.  Officer Doan then told Kagawa, "that's pretty much as wide as you're

gonna get right there" because if the handcuffs were adjusted even "one more [notch]"

they would "be pretty much like loose."  Dkt. No. 79-28 (Defs.' Video Exh. I, at 20:40-

20:49).  Officer Doan added that the handcuffs were "like maximum extent already."  *Id.*

at 20:50-20:53.  An officer can be heard chuckling in the background.  *Id.*

Kagawa did not complain about the handcuffs again.  And video footage shows

that for the remaining half hour before he was brought to the police station, Kagawa

remained seated under the tent without showing any visible discomfort, and he chatted

casually with the officers.  *Id.* at 21:00-52:00.

After Kagawa had been detained, Officer Dalere had gone to speak with Kaui.

At that point, he recognized Kaui—the two knew each other through "[m]utual

friends," but Officer Dalere had not "seen [Kaui] in years" until the incident.  Dkt. No.

93, at PageID.1206.  Officer Dalere had previously trained in boxing and jiu-jitsu at a

friend's house, and Kaui would "be off to the side" while Officer Dalere was there.  *Id.*

At the scene, Officer Dalere asked Kaui what had happened before officers arrived.

Dkt. No. 79-27 (Defs.' Video Exh. H, at 18:15-18:20).  Kaui said he received a text from

Kagawa accusing him of stealing the company fuel credit card, and Kagawa told Kaui

to come over to his house—Kagawa also allegedly told Kaui that he was going to "kill

you." *Id.* at 20:00-21:50; *see also* Dkt. No. 79-65, at PageID.889.  Kaui drove to Kagawa's

house, parked at the end of the driveway, and started walking up it.  Dkt. No. 79-4, at

PageID.338 (Kaui Decl. ¶ 6).  At that point, Kagawa "pulled" a handgun out and

pointed it at Kaui.  Dkt. No. 79-21, at PageID.403; Dkt. No. 79-4, at PageID.338-39 (Kaui

Decl. ¶¶ 7-8).  According to Kaui, Kagawa again accused Kaui of stealing from him, and

instructed Kaui to put his hands up.  Dkt. No. 79-4, at PageID.338-39 (Kaui Decl. ¶¶ 8-

9).  Kagawa also allegedly said that Kaui needed to give him the names of other

associates who had stolen the gas cards, or else Kagawa was going to shoot.  *Id.* at

PageID.339 (¶ 9).  As Kaui put it, Kagawa "was irate, repeating the accusations, and

threatening to kill me" during the stand-off, and "[e]very time I moved Mr. Kagawa

threatened to kill me." *Id.* (¶¶ 10-11).  After Officer Dalere finished speaking with Kaui,

Sergeant Santos and the supervising Lieutenant determined that there was probable

cause to arrest Kagawa for Terroristic Threatening in the First Degree under Hawai'i

Revised Statutes § 707-716 (2014).  Dkt. No. 79, at PageID.321 (Defs.' CSF ¶ 28).

Around 6:04 p.m., Kagawa was placed under arrest.  Dkt. No. 79-65, at

PageID.888.  Kagawa consented to officers entering his residence to collect firearms for

safekeeping.[2]  Dkt. No. 79, at PageID.320 (Defs.' CSF ¶ 19).  The three firearms that were

on Kagawa's person and directly around him when officers arrived were placed into

evidence.  *Id.* (¶ 21).  Thirteen other firearms that were found around Kagawa's

residence were placed in safekeeping.  *Id.* at PageID.321 (¶ 22).

After Kagawa was detained, an officer asked him what medications he needed,

and Kagawa directed the officer to his bedroom.  Dkt. No. 79-26 (Defs.' Video Exh. G, at

5:08-5:59).  The officer came back with several pill bottles, and asked Kagawa what each

was used for.  Dkt. No. 79-24 (Defs.' Video Exh. E, at 21:50-22:20).  Kagawa mentioned

that he was prescribed a blood pressure medication, but that he had not taken it in

several days.  *Id.*; Dkt. No. 79, at PageID.321 (Defs.' CSF ¶ 26).

The officers then transported Kagawa to the station, where the handcuffs were

removed.  Officer Dalere was the arresting officer, and according to HCPD policy, it

was his duty to complete the Arrestee Health Screening Form.  Dkt. No. 93, at

PageID.1248.  At his deposition, Officer Dalere testified that he could not recall

specifically if he asked Kagawa about any medical prescriptions, but that if it was not

him, it would have been "another officer on [the] scene, because I recall somebody

grabbing medications."  *Id.*  Officer Dalere stated that he "left that responsibility" of

---

[2]      The firearms that were on Kagawa's person were taken into evidence because
they were related to the criminal charge brought against him; the remaining firearms
that were not related to the investigation were retained by the HCPD for a brief time for
"safekeeping."  *See, e.g.*, Dkt. No. 79-21, at PageID.417.

transporting the medications from the scene to the station "with the officers that stood

by with [Kagawa] while I conduct[ed] the investigation" and interviewed Kaui.  *Id.* at

PageID.1251.  And consistent with that recollection, Officer Joshua Baumgarner states

that he retrieved the Ziplock bag of medication from Kagawa at the scene and that it

was transported to the cellblock.  Dkt. No. 79-9, at PageID.356 (Baumgarner Decl. ¶ 10).

He adds that "the medications made it to the department" but he was "not sure who

[he] gave the medication to."  Dkt. No. 93-3, at PageID.1404.  Kagawa's wife meanwhile,

recounts that on the evening of the incident, she "spoke with an HPD officer who

requested that [she] bring [her] husband's medication to the police station," "found" a

Ziplock gallon bag with medications inside, and then brought it to the station.  Dkt. No.

91, at PageID.1190 (Dalaney Kagawa Decl. ¶¶ 16-18).

     Video footage from the jail cell shows that Kagawa was resting until around

10:46 p.m., at which time he requested medical attention for a "tingly feeling in both his

arms."  Dkt. No. 79-40, at PageID.527; *see* Dkt. No. 79-37 (Defs.' Video Exh. R).  Within

five minutes of receiving a 911 call, the Hawai'i County Fire Department arrived to

Kagawa's cell and conducted a "[w]elfare check."  Dkt. No. 79-41, at PageID.528.

Kagawa stated that he was experiencing "numbness to his right hand," but an HCPD

officer "related that if the complaint wasn't life threatening, they would transport at a

later time," and the Fire Department determined that "EMS [was] not needed."  *Id.*; *see*

Dkt. No. 79-36, at PageID.521; Dkt. No. 79, at PageID.322 (Defs.' CSF ¶ 34).

Nonetheless, Kagawa was transported to the hospital within the hour, at

11:50 p.m.  Dkt. No. 79, at PageID.322 (Defs.' CSF ¶ 35).  There, Kagawa reported

"numbness with pain radiating up to his neck" and "[r]ight facial droop [was] noted in

triage."  Dkt. No. 79-42, at PageID.529.  He was treated for a "possible stroke," but

medical staff did not administer a tissue plasminogen activator, or tPA, a drug used to

treat strokes, because Kagawa had "rapidly improving" symptoms and medical

imaging came back as "normal."  *Id.* at PageID.529-530, 537-38.  Medical records listed a

diagnosis of "TIA (transient ischemic attack)," *id.* at PageID.539, which is not a stroke,

though it is sometimes colloquially referred to as a "mini-stroke."  Dkt. No. 79-53, at

PageID.682.  Kagawa was released that same night in "[g]ood" condition with

instructions to take a daily aspirin pill and to follow up with his primary care physician.

Dkt. No. 79-42, at PageID.539.

The following morning, Officer Dalere and Sergeant Santos interrogated

Kagawa.  Dkt. No. 79, at PageID.322 (¶ 38).  During the interrogation, Kagawa denied

that he threatened Kaui.  Dkt. No. 79-43 (Defs.' Video Exh. X, at 14:30-14:45).  Kagawa

explained that Kaui was a former employee who had damaged a company vehicle, and

then quit.  *Id.* at 2:57-4:25.  After Kaui quit, Kagawa learned that Kaui had been stealing

the gas cards.  *Id.* at 4:10-4:30.  Kagawa heard from other members of the community

that Kaui was saying he was going to kill Kagawa's family.  *Id.* at 7:15-8:10.  And on the

day of the incident, Kaui told Kagawa he was coming over.  *Id.* at 11:58-12:02.  Kagawa

maintained that he did not make any threats once Kaui arrived, and that he did not

point his gun at Kaui.  *Id.* at 14:32-14:47.

After the interrogation, Kagawa posted bail and was released from custody.  Dkt.

No. 91, at PageID.1191 (Dalaney Kagawa Decl. ¶ 20).  The next week, Kagawa returned

to the HCPD station to submit the identity theft packet related to the gas card theft.

Dkt. No. 90, at PageID.1181 (Kagawa Decl. ¶ 70).  In the following weeks, Kagawa

"attempted to retrieve [his] firearms" but his requests were "denied because of [his]

pending" charges.  *Id.* at PageID.1182 (¶ 72).  Eventually, around October 8, 2021,

Kagawa was able to retrieve his firearms.  *Id.* (¶ 73).  But Kagawa "discovered" that one

rifle was missing.  *Id.* at PageID.1183 (¶ 75).  He called Officer Dalere to request that

HCPD return the rifle to him, but Kagawa never received a response.  *Id.* (¶¶ 76-77).

In the weeks after the incident, Kagawa also "found" his cell phone on his

driveway.  *Id.* at PageID.1183-84 (¶ 78).  While examining his phone, Kagawa allegedly

"discovered there w[ere] incoming and outgoing texts during the timeframe I was in

police custody," and that "[w]hen I looked at my phone for the text messages, I

discovered they were erased from my phone."  *Id.*  He stated that he "later learned from

my cell phone service provider that the sim card to my cell phone was switched out,"

and Kagawa concludes that "[c]learly, the HPD tampered with my cell phone."  *Id.*

The charges against Kagawa were eventually dropped in May 2022.  *Id.* at

PageID.1182 (¶ 72).  Kagawa then initiated this action in January 2023 in state court

against Defendants HCPD, Officer Dalere, and Sergeant Santos.  Dkt. No. 1.  In

February 2023, Defendants removed the case to federal court under 28 U.S.C. § 1441 in

light of the federal questions raised in Kagawa's complaint.  *Id.*

Kagawa's complaint brings a total of eleven claims.  The first four are brought

under 42 U.S.C. § 1983:  Count I is for excessive use of force under the Fourth and

Fourteenth Amendments to the U.S. Constitution owing to overly tight handcuffing.  *Id.*

at PageID.35.  Count III alleges deliberate indifference under the Fourth and Fourteenth

Amendments for Defendants' alleged failure to address Kagawa's "medical needs."  *Id.*

at PageID.43.  Counts II and IV are directed principally at HCPD:  Count II alleges a

failure to train and supervise, *id.* at PageID.35-43, and Count IV alleges that HCPD "has

a policy, custom and practice of condoning and endorsing excessive force," *id.* at

PageID.43-44.

The remaining claims arise from other federal and state laws:  Count V alleges

that Kagawa "suffered a stroke" while in custody because HCPD negligently "failed to

promptly provide . . . medical attention and/or his medication."  *Id.* at PageID.44.

Count VI is for conversion and alleges that "Defendants unlawfully took pos[session]"

of Kagawa's "upper receiver for a rifle and one (1) .22 caliber rifle."  *Id.* at PageID.45.

Count VII is for assault and battery.  *Id.*  Counts VIII and IX are for intentional and

negligent infliction of emotional distress.  *Id.* at PageID.45-46.  Count X asserts a

violation of Kagawa's right to privacy under article I, section 6 of the Hawai'i

13

Constitution.  *Id.* at PageID.46.  And finally, Count XI asserts a violation of Kagawa's

right to keep and bear arms under the Second and Fourteenth Amendments to the U.S.

Constitution and under article I, section 17 of the Hawaiʻi Constitution.  *Id.* at

PageID.46-47.

Defendants have moved for summary judgment on all eleven claims.  Dkt. No.

78.  Kagawa opposes.  Dkt. No. 88.  The court held a hearing on the motion on

August 21, 2025.  Dkt. No. 102.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted to a moving party that shows "there is no

genuine dispute as to any material fact" and that they are "entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The moving party initially bears the burden of

showing there are no genuine disputes of material fact.  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).  If the movant makes that showing, the burden shifts to the

opposing party, who must "set forth specific facts that show a genuine issue for trial."

*Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (cleaned up).  An opposing

party cannot, however, survive summary judgment simply by offering "conclusory and

speculative" evidence.  *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th

Cir. 1979).

At summary judgment, the court draws all reasonable inferences in favor of the

nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  It is not for

the court at this stage to "weigh conflicting evidence with respect to a disputed material

fact," nor to assess the credibility of the evidence—those are determinations best left for

the factfinder.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th

Cir. 1987).  And if the facts and reasonable inferences drawn in the nonmoving party's

favor show that "a rational trier of fact might resolve the issue in favor of the

nonmoving party, summary judgment must be denied."  *Id.* at 631.

At the same time, summary judgment should be granted against a nonmoving

party that "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at

trial."  *Celotex Corp.*, 477 U.S. at 322.  That is because "a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all

other facts immaterial."  *Id.* at 323.

## DISCUSSION

### A.    Excessive Force Through Overly Tight Handcuffing

The heart of the case centers on whether HCPD used excessive force when

detaining and handcuffing Kagawa.  In Count I, Kagawa brings an excessive use of

force claim under the Fourth and Fourteenth Amendments—that is to say, under the

Fourth Amendment as incorporated against the States by the Fourteenth—pursuant to

42 U.S.C. § 1983.  Dkt. No. 1, at PageID.35.  He further contends that HCPD is liable for

that excessive force because it failed to train and supervise its officers (Count II), and

15

because it engaged in a pattern of similarly unlawful conduct (Count IV).  *Id.* at

PageID.35-44.  Kagawa does not dispute that Defendants had the legal authority to

arrest him and to use handcuffs to restrain him.  His contention, instead, is that he was

handcuffed too tightly, officers "refused to loosen" the handcuffs, and he "was in

extreme pain and discomfort in his hands and wrists" as a result.  *Id.* at PageID.18, 20.

It is well settled that "the right to make an arrest or investigatory stop necessarily

carries with it the right to use some degree of physical coercion or threat thereof to

effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  But it is equally true that the use

of force becomes "excessive when it is greater than is reasonable under the

circumstances."  *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), *overruled on other*

*grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  And so under certain circumstances,

"[t]ight handcuffing can constitute a Fourth Amendment violation."  *Reyes v. City of*

*Santa Ana*, 832 F. App'x 487, 490-91 (9th Cir. 2020).

The Ninth Circuit has recognized two theories under which a plaintiff may make

out an excessive force claim based on overly tight handcuffing.  First, where a plaintiff

"suffer[s] more than nominal injuries from their handcuffs," the unnecessary tightness

of the handcuffs can be found to violate the Fourth Amendment's protection against

unreasonable seizure.  *Id.*; *see Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993)

(denying summary judgment on qualified immunity where officer "fastened [plaintiff's]

handcuffs so tightly around his wrist that they caused [plaintiff] pain and left bruises

16

that lasted for several weeks" because "no reasonable officer could believe that the

abusive application of handcuffs was constitutional"). Second, the Ninth Circuit has

held that to "place and keep" a detainee "in handcuffs that were so tight that they

caused [the detainee] unnecessary pain" is a violation of that person's "Fourth

Amendment right to be free from an unreasonable seizure." *Meredith v. Erath*, 342 F.3d

1057, 1063 (9th Cir. 2003); *see also Reyes*, 832 F. App'x 487 at 490-91. Under this second

theory, it is the unnecessary pain that implicates the Fourth Amendment's protections,

regardless of whether any injuries follow.

In evaluating a claim under either theory, the court must conduct "an 'objective'

inquiry that pays 'careful attention to the facts and circumstances of each particular

case.'" *County of Los Angeles. v. Mendez*, 581 U.S. 420, 428 (2017) (quoting *Graham*, 490

U.S. at 396. Further, the "reasonableness" of any use of force is assessed from the

"perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." *Graham*, 490 U.S. at 396. Whether officers acted with objective

reasonableness must be evaluated "based upon the information the officers had when

the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). And while the

reasonableness inquiry is a fact-specific determination that typically should go to a jury,

a defendant may still prevail on summary judgment if, "after resolving all facts in favor

of the plaintiff," the court concludes "that the officer's use of force was objectively

reasonable under the circumstances." *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995) (cleaned up).

With these standards in hand, the court turns to Kagawa's arguments in support of his excessive force claim.

1.  Kagawa first contends that he suffered from an unreasonable seizure because the tight handcuffing resulted in more than nominal injuries.  Dkt. No. 88, at PageID.1145.  But "[c]ases that have considered excessive force claims related to overly tight handcuffing have found that complaints of bruising, swelling, scrapes, and pain, without evidence of more serious injury, indicate de minimus injury at best."  *Ramorino v. County of Los Angeles*, Case No. 23-cv-00090, 2024 WL 3468328, at *5 (C.D. Cal. May 31, 2024) (cleaned up).  And here, Kagawa does not offer evidence of even a de minimus injury—there is no evidence that would rationally support a finding that he was bruised, scratched, or otherwise harmed.

Nor is there evidence in the record—either from the contemporaneous body-worn camera video footage, or the medical records—that would rationally support a finding that Kagawa suffered any other physical injury from being handcuffed too tightly.  When Kagawa was taken to the hospital for radiating pain from his right arm up to his neck and a facial droop, the contemporaneous medical records show that he did not indicate any pain or injury to his wrists from the handcuffs.  *See* Dkt. No. 79-42.  His follow-up with a primary care physician in early August 2021 reflected that he had

been experiencing increased "stress and anxiety" after the incident, but he did not

report any other physical symptoms, such as wrist pain or injury.  Dkt. No. 79-48, at

PageID.613-14.

To be sure, Kagawa asserts that he suffered from a "stroke" after his arrest, and

he subjectively attributes the symptoms that he experienced at the hospital—which

included "numbness with pain radiating up to his neck," and "[r]ight facial droop,"

Dkt. No. 79-42, at PageID.529—to "being handcuffed too tightly."  Dkt. No. 88, at

PageID.1145; *see also* Dkt. No. 90, at PageID.1178-79 (Kagawa Decl. ¶ 62) ("I attribute the

minor stroke to the handcuffs being too tight.").  He states that since the incident, he has

"been to the doctor for nerve pain and numbness in my right hand, for anxiety, and for

post-traumatic stress disorder that stem from my wrongful arrest and being handcuffed

too tight."  Dkt. No. 90, at PageID.1184-85 (Kagawa Decl. ¶ 81).  And in December 2023,

Kagawa received "a surgical procedure for carpal tunnel syndrome."  *Id.* at

PageID.1185.

Kagawa does not, however, offer any expert evidence linking the allegedly tight

handcuffing to the transient ischemic attack or his subsequent physical and mental

health conditions.  And that is a problem for his claim, because in a § 1983 action, the

plaintiff must "demonstrate that the defendant's conduct was the actionable cause of

the claimed injury."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).

Both causation-in-fact and proximate causation must be established.  *Id.*; *see Mendez v.*

19

*County of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018).  To prove that an alleged

constitutional violation is the cause-in-fact of an injury, a plaintiff must show that but

for an officer's conduct, the injury would not have occurred.  *Mendez v. County of Los

Angeles*, 897 F.3d at 1076.  For proximate cause, the question is "whether the unlawful

conduct is closely enough tied to the injury that it makes sense to hold the defendant

legally responsible for the injury," *id.*, and often depends on whether the officer's

actions would have foreseeably caused the injuries, *see White v. Roper*, 901 F.2d 1501,

1506 (9th Cir. 1990).

Here, Kagawa fails to offer evidence from which a jury could rationally infer that

the officers' conduct actually caused the various medical ailments he alleges were the

result of the tight handcuffing.  That is to say, he offers various medical notes that show

he suffered a TIA and later experienced a variety of physical and mental health

symptoms, and he provides his own statements of belief about causation; but Kagawa

has not offered any evidence from which a jury could rationally infer that his subjective

belief about causation is correct.  And Kagawa cannot survive summary judgment

simply by offering "conclusory and speculative" evidence, which is all his own

subjective assertions amount to in this factual context.  *Thornhill Pub. Co.*, 594 F.2d at

738; *see Demarest v. City of Vallejo*, 44 F.4th 1209, 1226 (9th Cir. 2022) (granting summary

judgment to police on excessive force claim where plaintiff stated that "handcuffs could

have been applied 'with a lot less force on my wrists,' but he did not present any

evidence suggesting that the handcuffs were excessively tight or that they caused any injury").

Meanwhile, Defendants offer evidence from several medical experts that cuts the other way: these experts reject the handcuffing as the cause of Kagawa's various mental and physical health conditions. Ralph Purcell, M.D., for example, opined that "the application of the handcuffs to Mr. Kagawa on July 22, 2021, did not cause injury to Mr. Kagawa's wrists or underlying nerves." Dkt. No. 79-13, at PageID.372. Dr. Purcell further noted that "there are alternative etiologies that were more likely to be the basis for the claimant's carpal tunnel syndrome than the application of the handcuffs," including Kagawa's health conditions and his job duties. *Id.* Similarly, Charles Romero, M.D., summarized and reviewed Kagawa's medical history and presentation of symptoms on the day of the incident, and concluded that "the actions of the HPD did not cause or worsen any of his alleged injuries," including the TIA. Dkt. No. 79-53, at PageID.684.[3] Tanya J. D'Avanzo, Ph.D., conducted an independent psychological evaluation of Kagawa and opined that the incident "did not cause him to have PTSD," and "did not cause Mr. Kagawa's alleged severe emotional distress." Dkt. No. 79-55, at PageID.705.

---

[3] Dr. Romero also concluded that there is no evidence that Kagawa suffered a stroke on the day of the incident; instead, he suffered from a TIA, which "refers to a temporary blockage of blood flow to the brain" and is a separate diagnosis from a stroke. Dkt. No. 79-53, at PageID.682.

Defendants also offer medical notes showing that Kagawa had complained of wrist pain, high blood pressure, insomnia, and anxiety *prior* to the July 2021 incident. *See, e.g.*, Dkt. No. 79-46, at PageID.574 (2012 medical report noting "anxiety," "[p]ain in the back, neck"); *id.* at PageID.582 (2015 medical report noting insomnia); *id.* at PageID.586 (2015 medical report in which Kagawa noted "gout attacks in my knuckles, finger, wrist, elbow"); *id.* at PageID.593 (2016 medical report noting "complaints of LEFT wrist pain"); Dkt. No. 79-47, at PageID.594 (2019 medical report noting "pain to right arm" and "left wrist and left arm" and high blood pressure).  During a 2020 doctor visit, for example, Kagawa's physician noted he had "[r]inging in right ear," "[i]nsomnia," and "[a]nxiety."  Dkt. No. 79-48, at PageID.602; *see also* Dkt. No. 79, at PageID.323 (Defs.' CSF ¶ 48) ("In 2020, Plaintiff was diagnosed with hypertension and right ear tinnitus.").  These are the same symptoms that Kagawa now claims were caused by the handcuffing.  But Kagawa offers no admissible evidence explaining why these preexisting conditions are distinct from the symptoms he attributes to the tight handcuffing.

Indeed, facing this overwhelming medical evidence, Kagawa does not respond with any "specific facts that show a genuine issue for trial."  *Leisek*, 278 F.3d at 898 (cleaned up).  He offers no rebuttal expert evidence on any of these topics, and the bare lay opinion he offers is insufficient to meet his burden on summary judgment.  *See Ramorino*, 2024 WL 3468328, at *6 (granting summary judgment against plaintiff where

defendants offered expert report that handcuffing did not cause carpal tunnel syndrome and plaintiff only offered "a series of notes from medical professionals reporting that she sought treatment for pain in her wrists," which did "absolutely nothing to establish causation between the pain [the plaintiff] experienced after her handcuffing and her subsequent surgeries").  On this record, Kagawa cannot, as a matter of law, establish that he suffered more than nominal injuries from the allegedly excessive force used in handcuffing him.  The court therefore concludes that Kagawa's excessive force claim fails to the extent it is premised on the allegation that the handcuffing caused him to experience a TIA or other injuries.

2.  That leaves the theory that the use of force was unreasonable because he experienced "extreme pain" while handcuffed, even if no injury followed.  He states that as soon as he was handcuffed, he "immediately was in extreme pain and discomfort in my hands and wrists because the handcuffs were on too tight."  Dkt. No. 90, at PageID.1174 (Kagawa Decl. ¶ 42).  He recalls that while he "was sitting under the tent, I expressed extreme discomfort in my hands and wrists from being handcuffed too tight."  *Id.* at PageID.1175 (¶ 46).  Further, he states that although "[o]ne of the officers looked at my handcuffs," that officer "determined that he would not loosen the handcuffs because they were on the second to the last setting."  *Id.*  And so, Kagawa maintains that for the remainder of his detainment, he was in "extreme pain and discomfort."  *Id.*

In considering the merits of Kagawa's claim, the court finds helpful guidance in two Ninth Circuit opinions that reached opposing conclusions on the question of whether summary judgment should be granted against a plaintiff's excessive force claim. Although both are unpublished, they are consistent with published precedents and the court finds them to be persuasive authority.

On the one side is *Thompson v. Lake*, 607 F. App'x 624 (9th Cir. 2015), in which the Ninth Circuit reversed a district court's grant of summary judgment to defendants on an excessive force claim. In that case, plaintiff Thompson was driving his truck with a friend, and got into a near-accident caused by an unmarked van, which turned out to be part of a local police officer convoy returning from a SWAT team training. *Thompson v. Lake*, No. 11-CV-00644, 2013 WL 424436, at *1 (D. Nev. Jan. 31, 2013), *rev'd*, 607 F. App'x 624 (9th Cir. 2015). At a red light, Thompson's friend got out of the truck to tap on the van's window, and the van activated its siren. *Id.* Six police officers, still wearing SWAT uniforms, "approached Thompson's pickup with guns drawn" and told Thompson and his friend "to get out of the pickup with profanity-riddled instructions." *Id.* Police officers then "opened the passenger door and pulled [Thompson's friend] out of the truck, handcuffing him." *Id.* Thompson's friend "requested that his handcuffs be loosened," *id.*, at three separate times in forty-five minutes, *id.* at *6. And the defendants maintained that after the first request, "an officer examined the cuffs, squeezed them, and determined the cuffs were not too tight." *Id.*

24

The district court in that case granted summary judgment against the plaintiffs, but the Ninth Circuit reversed, holding that a plaintiff's "request that police loosen the handcuffs was sufficient" to satisfy any requirement that a plaintiff "complain that the handcuffs were too tight," and the Ninth Circuit further detailed that the plaintiff "was not required to show that the handcuffs caused visible physical injury; it [wa]s enough that the handcuffs caused [the plaintiff] unnecessary pain." *Thompson*, 607 F. App'x at 625. As the panel explained, summary judgment was improperly granted against plaintiffs because "[w]hether the handcuffs were actually too tight, and whether the officers checked the handcuffs to ensure that they were not too tight, [were] disputed factual issues that preclude summary judgment." *Id.*[4]

On the other side is *Knickerbocker v. United States*, 858 F. App'x 243 (9th Cir. 2021), in which the Ninth Circuit affirmed a district court's grant of summary judgment on an excessive force claim against a plaintiff. Critical to the decision in *Knickerbocker* was the fact that the encounter was captured by video. As the Ninth Circuit observed, summary judgment was appropriate where "the videos show that the [officials] used a minimal level of force in handcuffing" the plaintiff. *Id.* at 244. The panel concluded

---

[4]     In support of its holding, the *Thompson* panel cited *LaLonde v. County of Riverside*, in which the Ninth Circuit held that it was error to grant summary judgment on an excessive force in handcuffing claim where a plaintiff testified that he told officers, "[t]hese handcuffs are too tight" and "[t]hey're cutting off my circulation," and in response, the "officers told [the plaintiff] if he would only hold still, he would be fine." 204 F.3d 947, 952 (9th Cir. 2000).

that plaintiff's "complaints of excruciating pain are simply not reflected in the video footage of the arrest," given that the plaintiff "was handcuffed behind his back for no more than an hour." *Id.* And during that time, he "talked to the rangers about matters completely unrelated to any alleged pain or discomfort." *Knickerbocker v. United States*, No. 16-cv-01811, 2020 WL 1433141, at *8 (E.D. Cal. Mar. 24, 2020), *aff'd*, 858 F. App'x 243 (9th Cir. 2021).

Kagawa's case falls comfortably on the *Knickerbocker* side of the line. Kagawa has offered his own declaration as the one piece of evidence that the tight handcuffing caused him pain. He notes that the officers "did not offer me any alternative options to the handcuffs being too tight and relieve the extreme pain and discomfort I was getting from the handcuffs." Dkt. No. 90, at PageID.1175 (Kagawa Decl. ¶ 46). Kagawa also states that "[t]he police acknowledged that the handcuffs on me were too tight but the HPD refused to loosen them." *Id.* at PageID.1176 (¶ 52). But as in *Knickerbocker*, Kagawa's statements are flatly contradicted by the video evidence: Kagawa's complaints of excruciating pain "are simply not reflected in the video footage." *Knickerbocker*, 858 F. App'x at 244. While he made one comment about the "[expletive] handcuffs," video footage shows that officers responded to the comment, and after that time Kagawa did not show any visible discomfort. Defs.' Video Exh. I, at 20:37-20:39. Instead, he talked with officers for half an hour about matters "completely unrelated to any alleged pain or discomfort." *Knickerbocker*, 2020 WL 1433141, at *8. Moreover, the

multiple body camera videos do not show that any officer "acknowledged" that the handcuffs were too tight.[5]  It is true that Officer Doan declined to adjust the handcuffs, but only because he observed that the handcuffs were "pretty much as wide as you're gonna get right there" and he explained to Kagawa that they were extended to "like maximum extent already."  Dkt. No. 79-28 (Defs.' Video Exh. I, at 20:40-20:53).

On this record, no reasonable jury could find that Defendants used excessive force against Kagawa.  In reaching this conclusion, the court fully accepts—for summary judgment purposes—the truth of Kagawa's declaration statements that he in fact was in excruciating pain.  But the significant amount of video footage provided in this case makes it undisputable that Kagawa did not meaningfully alert the officers to the "extreme discomfort" he experienced.  It is also clear from the video footage that the totality of the circumstances did not otherwise alert the officers to his discomfort, either.  Evaluating the "reasonableness" of the officers' conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, no rational jury could conclude that the officers at the scene had any

---

[5]    Kagawa points out that there is an audible chuckle from an officer in the background of the video around the same time that Kagawa makes the comment about the handcuffs.  Dkt. No. 79-28 (Defs.' Video Exh. I, at 20:50-20:53).  But there is nothing in the video that would rationally support a finding that any officer ignored or responded disrespectfully to Kagawa's comment about the handcuffs—let alone anything that would support such a finding against the named individual Defendants, Officer Dalere and Sergeant Santos, who were not within earshot of Kagawa during this time.

indication that Kagawa was in the degree of pain he now says he was in.  In other

words, "based upon the information the officers had when the conduct occurred,"

*Saucier*, 533 U.S. at 207, the video evidence demonstrates that their conduct was

reasonable as a matter of law.

That is especially so for the two named individual Defendants, Officer Dalere

and Sergeant Santos.  The evidence shows that neither was involved in the handcuffing

of Kagawa, and that neither heard Kagawa make any complaints about his discomfort.

Officer Carvalho, who is not a named defendant in this action, handcuffed Kagawa.

Dkt. No. 79, at PageID.319 (Defs.' CSF ¶ 11).  And Officer Doan—who is similarly not

named as a defendant—examined the handcuffs after Kagawa complained about them.[6]

Sergeant Santos, in contrast, states that Kagawa "never complained to me about his

handcuffs being too tight or causing him pain."  Dkt. No. 79-3, at PageID.335 (Santos

Decl. ¶ 15).  And Officer Dalere similarly states that he "never heard Plaintiff complain

about his handcuffs."  Dkt. No. 79-2, at PageID.331 (Dalere Decl. ¶ 13).  Nothing in

Kagawa's declaration "suggests that [either named officer] heard [him] complain about

---

[6]    After Defendants filed their summary judgment motion, Kagawa moved for
leave to amend the operative complaint to add Officer Carvalho as a Defendant.  Dkt.
No. 82.  The assigned magistrate judge denied the motion on the ground that Kagawa
was not diligent in seeking to amend the scheduling order, Dkt. No. 95, and Kagawa
did not seek further review of that decision.  But the magistrate judge's decision is not
material to the outcome of the summary judgment motion because the court concludes
that Kagawa's evidence is insufficient as a matter of law to show that *any* officer used
excessive force in using overly tight handcuffing.

the tight handcuffs, let alone that [they] refused to address the complaint," meaning

they cannot be held liable for any alleged constitutional violation of Kagawa's rights.

*Rayzberg v. County of Los Angeles*, Case No. CV 23-2585, 2024 WL 3055474, at *7 (C.D.

Cal. May 8, 2024).

 The court therefore GRANTS Defendants' motion for summary judgment on

Count I of Kagawa's complaint, in which he alleges excessive force based on overly

tight handcuffing.[7]

 And because Kagawa has not offered sufficient evidence of any constitutional

violating resulting from overly tight handcuffing, he cannot show that HCPD is at fault

for any such violation.  Under the standards governing municipal liability, a "county is

liable under Section 1983 if it maintains a 'policy or custom' deliberately indifferent to a

plaintiff's constitutional rights that caused his constitutional injury."  *Greer v. County of

San Diego*, 726 F. Supp. 3d 1058, 1075 (S.D. Cal. 2023) (citing *Monell v. New York City

Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Given the insufficient evidence of any

constitutional injury, Kagawa cannot show HCPD is responsible for one.  The court

---

[7] Because Kagawa has not offered sufficient evidence of any constitutional
violation, the individual Defendants also prevail in their argument that they are entitled
to qualified immunity as to any claims brought against them in their individual
capacities.  *See Hughes*, 31 F.4th at 1220 (explaining that an officer enjoys qualified
immunity unless a plaintiff can establish both that there was a constitutional violation
and that the violated right was clearly established).

therefore GRANTS summary judgment to Defendants on Counts II and IV, to the extent

Kagawa seeks to hold HCPD liable for the overly tight handcuffing of its officers.

**B.    Failure to Provide Adequate Medical Care**

Kagawa next contends that Officer Dalere's "failure to bring Mr. Kagawa's

medicine [to the station] contributed to Mr. Kagawa's injuries," including the

"symptoms of an apparent stroke."  Dkt. No. 88, at PageID.1147.[8]  He thus alleges that

as an arrestee, he was denied "objectively reasonable medical care in the face of medical

necessity creating a substantial and obvious risk of serious harm, including by

summoning medical assistance" in violation of his Fourth and Fourteenth Amendment

rights.[9]  *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 771 (9th Cir. 2025).

---

[8]    Kagawa might have also relied on a theory that the medical care was delayed once he requested attention in his cell, or upon arrival to the station.  *See, e.g.*, Dkt. No. 90, at PageID.1178 (Kagawa Decl. ¶ 61).  And at the hearing on this motion, his counsel suggested that that basis for a deliberate indifference claim was preserved via this statement in opposition to the summary judgment motion:  "Mr. Kagawa finally received medical attention from the HFD approximately five and a half hours after he arrived at the detention facility."  Dkt. No. 88, at PageID.1147.  But Kagawa did not make any further argument to that effect in his brief, meaning that it was abandoned.  And in any event, such an argument would fail because Kagawa does not offer any evidence that once he requested medical attention, he was denied it—to the contrary, when he complained in his cell that he had a tingly feeling in his arms, the Fire Department responded within a matter of minutes.

[9]    The Fourteenth Amendment's Due Process Clause protects Kagawa's right not to be punished prior to an adjudication of guilt.  *See Graham*, 490 U.S. at 395 n.10.  The Fourth Amendment, incorporated against the States through the Fourteenth, ensures Kagawa's right to be free from the excessive use of force, including through the deprivation of necessary medical care.  *D'Braunstein*, 131 F.4th at 769.

When evaluating a claim alleging a failure to provide adequate medical care under the Fourth and Fourteenth Amendments, the "common underlying constitutional question . . . is whether an officer's provision (or deprivation) of medical care was objectively unreasonable." *Id.* at 769. A plaintiff advancing such a claim must show that (1) "the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined"; (2) "those conditions put the plaintiff at substantial risk of suffering serious harm"; (3) "the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious"; and (4) "by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

Here again, Kagawa's claim fails because he cannot establish causation: he has offered no evidence that Officer Dalere's failure to bring his medication caused the TIA or the related symptoms that he experienced. Kagawa states in his declaration that he

---

Kagawa also appears to rely on the Eighth Amendment's protection against cruel and unusual punishment for a failure to provide medical treatment based on a "serious medical need" to which officials were "deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). To the extent that he does, any such claim fails because Kagawa has not shown that Officer Dalere acted purposefully in denying him access to medication, or that any such denial caused his injuries, as detailed below. *See id.* (explaining that to prevail on such a claim, a plaintiff must show "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and "harm caused by the indifference").

"believe[s] if I had my medicine when I arrived at the detention center then I would not have been injured as bad."  Dkt. No. 90, at PageID.1178.[10]  But that statement does not create a genuine issue of material fact on causation because Kagawa offers no admissible medical evidence to support his belief.  That is, if this case were permitted to go to trial, Kagawa could not competently testify that his inability to access his medication caused the TIA and other symptoms because that is outside of the scope of lay opinion.  *See Gray v. Clark*, 654 F. Supp. 3d 1062, 1071 (E.D. Cal. 2023) ("[C]ourts do not allow lay witnesses to testify as to the cause, effect, diagnosis or prognosis of their injuries, because such opinions require testimony from a medical expert."); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5 (9th Cir. 2002) ("Villiarimo cites only her own self-serving and uncorroborated affidavit and deposition testimony in support of this assertion, *and provides no indication how she knows this to be true*." (emphasis added)).  And although testimony from a medical expert could possibly serve as this link, Kagawa has offered nothing of the sort on summary judgment.

While Kagawa has offered no evidence of causation, Defendants have provided admissible evidence, including an expert opinion, that Kagawa's symptoms were *not* caused by Officer Dalere's failure to bring medication to the station.  It is undisputed

---

[10]    Kagawa does not specify *which* medicine would have prevented which alleged injuries.  But viewed most favorably, Kagawa appears to be asserting his belief that his blood pressure medication would have reduced or prevented the symptoms of tingling in his arms and facial droop.

that Kagawa had not taken his blood pressure medication for at least several days

before the incident.  *See, e.g.*, Dkt. No. 79, at PageID.321 (Defs.' CSF ¶ 26).  That fact

tends to cut against Kagawa's argument that his not taking the medicine on that specific

day caused his symptoms.  More importantly, one of Defendants' medical experts,

Charles Romero, M.D., opined that while "blood pressure medication and control of

overall blood pressure is favorable for prevention of TIA and stroke, any alleged

withholding of blood pressure medication would not have caused the reported

symptoms that were classified as [a] possible TIA."  Dkt. No. 79-10, at PageID.359; *see id.*

at PageID.360 ("Not receiving or taking blood pressure medication while in HPD

custody was irrelevant to any of Mr. Kagawa's claimed injuries.").  Kagawa does not

offer any evidence to contradict that expert opinion, and he has thus failed to create a

genuine dispute on this issue.  *See Shorter v. Baca*, No. 19-56182, 2021 WL 4958857, at *2

(9th Cir. Oct. 26, 2021) (affirming denial of plaintiff's motion for judgment as a matter of

law where "the jury heard no evidence that suspending [plaintiff's] medication caused

her injury or put her at substantial risk of serious harm" because such a claim requires

"demonstration of injury and substantial risk of serious harm for inadequate medical

care claims").

Kagawa also does not point to any evidence that he requested his blood pressure

medication at any point while in custody.  Instead, HCPD did provide Kagawa with the

one medication he requested while he was at the station:  when Kagawa asked for his

sleeping medication after returning from the hospital, he received and took it.  Dkt. No.

79-36, at PageID.521-23.  And while a failure to provide a detainee with their medication

promptly could lead to a constitutional violation in some circumstances—such as where

a person with diabetes needs insulin—Kagawa has not pointed to any evidence that he

had an immediate need for any medication, let alone that his medication would have

ameliorated any symptoms he suffered.  *See Schwarz v. Lassen County ex rel. Lassen Cnty.*

*Jail*, No. 10-cv-03048, 2013 WL 5425102, at *16 (E.D. Cal. Sept. 27, 2013), *aff'd*, 628 F.

App'x 527 (9th Cir. 2016).

As an additional matter, Kagawa has produced no evidence to establish that

Officer Dalere's alleged failure to bring Kagawa's medication to the station was an

"intentional decision," or that an objective officer in Dalere's position "would have

appreciated the high degree of risk involved" in not ensuring Kagawa's medication was

brought to the station.  *Gordon*, 888 F.3d at 1125.  To prove these elements, a plaintiff

must "prove more than negligence but less than subjective intent—something akin to

reckless disregard."  *Id.* (cleaned up).  Put differently, a plaintiff must show "objective

deliberate indifference."  *Id.*  Kagawa cannot make that showing.  His complaint alleges

deliberate indifference.  Dkt. No. 1, at PageID.43.  But the evidence supports, at most,

the finding that Officer Dalere's alleged failure to make sure that Kagawa's medication

made it to the station was negligent by not ensuring that there was a clear chain of

custody for the Ziploc bag of medications that Officer Baumgarner collected.  That is

not enough to establish objective deliberate indifference or reckless disregard. Once Kagawa started to display symptoms, moreover, Officer Dalere was no longer responsible for monitoring him or providing medical care. And at that time, Kagawa received the medical attention he needed: when Kagawa called for help in his cell, he was promptly treated by the Fire Department and was later transported to the hospital.

Based on the evidence produced at summary judgment, the only legally permissible conclusion is that Officer Dalere did not violate Kagawa's Fourth and Fourteenth Amendment rights to adequate medical care. The same goes for Sergeant Santos, as there is a complete dearth of any evidence against him on this claim. And because there is insufficient evidence to prove that Officer Dalere and Sergeant Santos violated Kagawa's constitutional rights through a failure to provide adequate medical care, they are entitled to qualified immunity on this claim as well. *See Hughes*, 31 F.4th at 1220. The court therefore GRANTS summary judgment to Defendants on Count III. Finally, the court GRANTS summary judgment to Defendants on Counts II and IV, to the extent those counts seek to hold HCPD liable for its officers' alleged failure to provide adequate medical care, because there is insufficient evidence that any officer failed to do so.

//

//

//

C.    **Remaining Claims**

The remaining federal claim is an alleged violation of Kagawa's Second and

Fourteenth Amendment right to keep and bear arms.[11]  And the state claims of

negligence, conversion, assault and battery, and intentional and negligent infliction of

emotional distress are also still on the table.

1.  Kagawa claims that his Second Amendment rights were violated because

Defendants "stole" one of his rifles and "refused to return it."  Dkt. No. 1, at PageID.47.

As Defendants point out in their summary judgment motion, there is no evidence in the

record supporting this allegation.  Dkt. No. 78-1, at PageID.307.  And Kagawa neither

points to any admissible evidence nor makes any argument supporting it in his

opposition brief, meaning that he has abandoned this claim.

And the claim also fails on the merits.  While Kagawa states in his declaration

that he "believe[s] the HPD stole the upper receiver and my registered .22 caliber rifle

when they searched my house," that statement alone is insufficient to create a genuine

issue of material fact.  Dkt. No. 90, at PageID.1176.  That is because his *belief* is not

supported by any other evidence that would show this fact to be true.  *See Villiarimo*, 281

---

[11]    At the hearing on this motion, Kagawa's counsel represented that Kagawa was
maintaining a "right to counsel" claim based on statements in his declaration that he
did not consent to being interrogated without counsel present.  *See* Dkt. No. 90, at
PageID.1180 (Kagawa Decl. ¶ 67).  But, as Kagawa's counsel conceded, that claim
appears nowhere in his complaint or his opposition to the summary judgment motion,
and the court therefore will not consider it.

F.3d at 1059 n.5 ("Villiarimo cites only her own self-serving and uncorroborated affidavit and deposition testimony in support of this assertion, *and provides no indication how she knows this to be true.*" (emphasis added)).  While the facts Kagawa describes might support the *suspicion* or *concern* that officers took one of his rifles, they are not sufficient to support a rational jury finding that HCPD did so.  Any number of other scenarios could just as easily be true, and a jury finding on that point would be based on pure speculation.  The court therefore GRANTS summary judgment to Defendants on this issue.  Because Kagawa's claim under article I, section 17 of the Hawai'i Constitution and his conversion claim are both based on the same facts, the court GRANTS summary judgment to Defendants on Count XI (violation of right to keep and bear arms), and on Count VI (conversion).

And, here again, any claim against HCPD would fail because Kagawa's evidence is insufficient to show that any HCPD officer violated his rights.  The court therefore GRANTS summary judgment to Defendants on Counts II and IV, to the extent they are based on the allegation that officers stole Kagawa's rifle.

2.  The court next turns to Kagawa's five remaining state law claims:  negligence (Count V), assault and battery (Count VII), intentional infliction of emotional distress (Count VIII), negligent infliction of emotional distress (Count IX), and an invasion of privacy (Count X).

Start with Kagawa's invasion of privacy claim, which rests on the allegation that "Defendants took possession of Mr. Kagawa's cell phone without his permission and changed information that was held within Mr. Kagawa's cell phone." Dkt. No. 1, at PageID.46. Because Kagawa's written submission does not meaningfully oppose Defendants' motion on this issue—and because, in any event, the available evidence does no more than support a *suspicion* that officers engaged in the conduct of which Kagawa complains—the court GRANTS summary judgment to Defendants on Count X.

Defendants contend that the remaining tort claims are barred because Officer Dalere and Sergeant Santos are entitled to a qualified or conditional privilege under Hawaiʻi state law. In Hawaiʻi, "non-judicial government officials acting in the performance of their public duties enjoy a 'qualified or conditional privilege.'" *Dawkins v. City & County of Honolulu*, Civ. No. 10-00086, 2011 WL 1598788, at *15 (D. Haw. Apr. 27, 2011) (quoting *Towse v. State*, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982)). This privilege "protects the official from liability for tortious acts unless the injured party demonstrates by 'clear and convincing proof' that the official was motivated by 'malice and not by an otherwise proper purpose.'" *Id.* (quoting *Towse*, 64 Haw. at 631, 647 P.2d at 702). And it "shields all but the most guilty nonjudicial officials from liability, but not from the imposition of a suit itself." *Edenfield v. Est. of Willets*, No. Civ. 05-00418, 2006 WL 1041724, at *11 (D. Haw. Apr. 14, 2006). For tort claims other than defamation, a plaintiff must show that officials acted with "actual malice," which in this context

means "the intent, without justification or excuse, to commit a wrongful act, reckless disregard of the law or of a person's legal rights, and ill will; wickedness of heart." *Wereb v. Maui County*, 727 F. Supp. 2d 898, 924 (D. Haw. 2010) (cleaned up). And, importantly, if the individual officers are held to be immune from suit, "it follows that [HCPD] would also be immune." *Cadiente v. City & County of Honolulu*, Civil No. 24-00022, 2024 WL 1703126, at *7 (D. Haw. Apr. 19, 2024) (cleaned up).

Kagawa points to the same facts that supported his excessive force claim as the basis for his state law assault and battery claims. *See* Dkt. No. 88, at PageID.1152-53. But even assuming that he could support those claims factually, he nowhere shows that the officers' failure to adjust his handcuffs was done with the intent to cause Kagawa harm, or that any of the officers—let alone the named officer defendants who were not involved in the handcuffing or Kagawa's complaint about his comfort—acted with "ill will" or "wickedness of heart." The officers—and, by extension, HCPD—are therefore entitled to the conditional privilege for these claims, and the court GRANTS summary judgment to Defendants on Count VII. *See Dawkins*, 2011 WL 1598788, at *15 (denying summary judgment on state law claims because a jury could find malice where plaintiff stated in his declaration that "officers grabbed and punched him, tripped him, and shot him with a taser, even though he told the officers he was going to grab his things and leave").

Kagawa also alleges intentional and negligent infliction of emotional distress claims based on Officer "Dalere's undisclosed relationship with Mr. Kaui as well [as] Dalere's stress reaction to Plaintiff's firearms."  Dkt. No. 88, at PageID.1154.  But here again, he offers no evidence that Officer Dalere acted with malice.  To the contrary, Defendants have offered evidence that Officer Dalere only noticed that he knew Kaui after both he and Kagawa were detained.  *See* Dkt. No. 93, at PageID.1206.  Moreover, there is no admissible evidence in the record that Officer Dalere suffered a "stress reaction."  And Kagawa has not offered any admissible evidence showing that he suffered severe emotional distress that was *caused by* either of these facts, or by any of Officer Dalere's actions.  For these reasons, Officer Dalere is entitled to the state conditional privilege, and Kagawa's claims fail as a matter of law.  The court GRANTS summary judgment to Defendants on Counts VIII and IX.

The negligence claim similarly fails on both a factual basis and because of the conditional privilege.  Kagawa's negligence claim is founded on the excessive use of force and alleged failure to provide adequate medical care.  But both of those claims failed since Kagawa did not show that any of his injuries were caused by Defendants' conduct, and his negligence claim fails for that some reason as a matter of law.  And in both of those scenarios, Kagawa did not offer any evidence that the officers' intent rose to the level of actual malice or wickedness of heart.  The court therefore GRANTS summary judgment to Defendants on Count V.

## <u>CONCLUSION</u>

In sum, Kagawa's excessive force claim fails because he cannot show that the

allegedly tight handcuffs caused any injury, or that any officer acted unreasonably in

response to his one expression of discomfort.  And his deliberate indifference claim fails

because Officer Dalere's failure to bring the blood pressure medication to the station

was negligent at worst, and it did not cause any of Kagawa's injuries.  Kagawa's

remaining federal claim fails for a lack of evidence, and his state claims fail both

because Defendants are entitled to a conditional privilege and because Kagawa has

failed to factually support each.

For the foregoing reasons, Defendants' motion for summary judgment is

GRANTED.

IT IS SO ORDERED.

DATED:  September 4, 2025, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

---

Civil No. 23-00105 MWJS-KJM; *Christopher Kagawa v. County of Hawai'i Police Department,* et al.; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT